## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00151-JAW |
| | ) | |
| JONATHAN BOWERS | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON SENTENCING ISSUES

Applying binding First Circuit law, the Court concludes that a defendant who has four state of Maine burglary convictions is subject to the enhanced penalty provisions of the Armed Career Criminal Act (ACCA) and its corresponding guideline provision. The Court does not conclude that the defendant possessed a firearm in connection with another felony offense, obstructed justice, or should be denied acceptance under the guidelines.

## I.    GENERAL BACKGROUND

On November 10, 2016, a federal grand jury indicted Jonathan Bowers for possession of a firearm after having been convicted of a number of felonies, an alleged violation of 18 U.S.C. § 922(g)(1). *Indictment* (ECF No. 1). On September 14, 2017, Mr. Bowers pleaded guilty to being a felon in possession of a firearm. *Minute Entry* (ECF No. 56). On February 7, 2018, the Court held a presentence conference and counsel requested that the Court schedule an evidentiary hearing to resolve some sentencing issues. *Minute Entry* (ECF No. 67); *Notice of Hr'g* (ECF No. 68). After some delay, the Court held the evidentiary hearing on July 24, 2018. *Minute Entry*

(ECF No. 82). A transcript of the hearing was filed on August 7, 2018. *Tr. of Proceedings*, *Evidentiary Hr'g* (ECF No. 85) (*Tr.*).

On September 4, 2018, the parties filed simultaneous memoranda. *Mem. in Aid of Sentencing* (ECF No. 86) (*Def.'s Mem.*); *Gov't's Sentencing Mem.* (ECF No. 87) (*Gov't's Mem.*). On September 18, 2018, the parties filed simultaneous responses. *Reply Mem. in Aid of Sentencing* (ECF No. 88) (*Def.'s Opp'n*); *Gov't's Sentencing Resp.* (ECF No. 89) (*Gov't's Opp'n*). On September 26, 2018, Mr. Bowers filed a personal narrative and a narrative from Deputy Sheriff Jeremy A. York. *My Personal Narrative*, *Def.'s Ex.* 1 (ECF No. 90) (*Def.'s Statement*); *Id. Narrative for Dep. Jeremy A. York*, *Def.'s Ex.* 2 (*York Narrative*).

## II.   THE LEGAL ISSUES

The parties briefed the following legal issues:

(1) whether Mr. Bowers is subject to the provisions of the Armed Career Criminal Act (ACCA);

(2) whether Mr. Bowers used his firearm in connection with another felony and is subject to a four-level sentencing enhancement under United States Sentencing Commission Guideline (U.S.S.G.) § 2K2.1(b)(6)(B);

(3) whether Mr. Bowers is subject to a two-level sentencing enhancement under U.S.S.G. § 3C1.1; and

(4) whether Mr. Bowers is entitled to a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

## III.   THE ARMED CAREER CRIMINAL ACT

## A.    Background

Known as the Armed Career Criminal Act (ACCA), title 18 of United States

Code section 924(e) provides enhanced penalties for illegal firearm possession:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony . . . committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

§ 924(e)(1).[1]  ACCA defines "violent felony" as:

> [A]ny crime punishable by imprisonment for a term exceeding one year . . . that--
>
> (ii) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

§ 924(e)(2)(B)(ii).[2]  This clause is known as the enumerated clause, because it lists

specific crimes that qualify as ACCA predicates.  *See Dimott v. United States*, 881

F.3d 232, 234 (1st Cir. 2018) (discussing the enumerated clause).  In addition to the

ACCA, the United States Sentencing Commission Guidelines have a provision that

---

[1]    Section 924(e)(1) includes "a serious drug offense" as a potential predicate.  But Mr. Bowers has not previously been convicted of any drug offenses, so the Court limits its analysis to the burglary convictions.

[2]    Section 924(e)(2)(B)(i) contains a definition of "violent felony" that includes a felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another."  Section 924(e)'s "force clause" is not at issue in this case.  Also, § 924(e)(2)(C) addresses juvenile convictions and is not relevant here.  In *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015), the United States Supreme Court invalidated the so-called residual clause of § 924(e)(2)(B) holding that it violated the Constitution's guarantee of due process.  The residual clause is not at issue in this case.

dovetails with the ACCA and enhances the calculation of the sentencing guideline range for a person subject to the ACCA. U.S.S.G. § 4B1.4 (Armed Career Criminal).

Mr. Bowers' Presentence Investigation Report details his criminal record. *Presentence Investigation Report* (PSR). Relevant to his ACCA status, the PSR lists the following burglary convictions:

> (1) 5/12/2010 (Date of Arrest): Count 1: Burglary (Class B), Kennebec County Superior Court, Augusta, Maine, Docket No. 2010-CR-00335; 07/08/10: Ct. 1: 5 years DOC (Department of Corrections), all but 6 months suspended, 3 years probation.

> (2) 6/29/2006 (Date of Arrest): Count 2: Burglary (Class B), Count 4: Burglary (Class C), Kennebec County Superior Court, Augusta, Maine, Docket No.: 2006-CR-00660; Counts 2: 4 years DOC, all but 60 days suspended, 3 years probation, $17,150 restitution; Count 4: 60 days concurrent to Count 2;

> (3) 6/15/2006 (Date of Arrest): Count 1: Burglary (Class C), Kennebec County Superior Court, Augusta, Maine, Docket No.: 2006-CR-00747; Count 1: 60 days jail to be served concurrently with CR-06-660 and each other.

PSR ¶¶ 30-31, 36. The Government and Mr. Bowers disagree as to whether these four burglary convictions qualify him for ACCA status.

## B. The Positions of the Parties

### 1. Jonathan Bowers' Position

Although Mr. Bowers concedes that he has four prior burglary convictions from the state of Maine, he maintains that his burglary convictions do not count as ACCA predicates because Maine's definition of "structure" is broader than the generic definition of structure allows. *Def.'s Mem.* at 7-8. Thus, he contends, the Court may

examine so-called *Shepard*[3] documents. *Id.* at 8-9. Mr. Bowers argues that an examination of the Rule 11 colloquy for his June 15, 2006 burglary demonstrates that he entered into a storage trailer, not a dwelling, which he contends does not fit within the generic definition of burglary. *Id.*

### 2. The Government's Position

From the Government's perspective, the issue begins and ends with Mr. Bowers' convictions for burglary under state of Maine law. *Gov't Mem.* at 5-7. The Government points out that in *United States v. Duquette*, 778 F.3d 314, 318 (1st Cir. 2015), the First Circuit concluded that Maine's burglary statute "is indivisible and that [it] falls within the generic definition of burglary as defined by *Taylor* [*v. United States*, 495 U.S. 575 (1990)]." *Id.* at 7. In the Government's view, *Duquette* "remains controlling precedent in this circuit." *Id.* Furthermore, the Government contends that under Supreme Court authority, *Descamps v. United States*, 570 U.S. 254, 261 (2013) and *Mathis v. United States*, __ U.S. __, 136 S. Ct. 2243, 2248 (2016), "the proffered *Shepard* documents cannot be considered, and the defendant's attempt at collateral attack in his forum must fail." *Id.* The Government maintains that *Mathis* did not overrule *Duquette* and therefore Mr. Bowers' "Maine burglary convictions qualify as ACCA predicates." *Id.*

### 3. Jonathan Bowers' Opposition

In his response, Mr. Bowers argues that in *Duquette*, the First Circuit did not "look at or consider the definitions of "structure" and "dwelling place." *Def.'s Opp'n*

---

[3]     *Shepard v. United States*, 544 U.S. 13 (2005).

at 4-5. Mr. Bowers says that in *Mathis*, the Supreme Court provided "a new and different task for determining whether the 'means' in the Maine burglary statute— and not the 'elements'—require this court to find that the Maine burglary statute qualifies for purposes of the ACCA." *Id.* at 5. Mr. Bowers observes that in *Mathis*, the United States Supreme Court "held that an Iowa burglary statute that contained a similar definition of 'structure' to the Maine statute did not qualify for ACCA purposes because it provided for alternative means for commission of burglary, which were broader in definition than the generic definition of burglary." *Id.* (citing *Mathis*, 136 S. Ct. at 2257). He also contends that *Mathis* authorized the Court's consideration of the *Shepard* documents that he provided. *Id.* at 6 (citing *Mathis*, 137 S. Ct. at 2257, n.7). Mr. Bowers concedes that "*Duquette* may still be good law for the proposition that when the elements of the crime are viewed on the face of the statute alone, then Maine's burglary statute is a generic statute." *Id.* However, he argues that "*Mathis* . . . requires an additional analysis of alternative means of communication, which were not considered by the *Duquette* court." *Id.* When the *Mathis* analysis is performed, he writes, "it is clear that the alternative locational means of committing burglary in Maine make the statute broader than the generic version and Maine's burglary statute can no longer qualify for ACCA purposes." *Id.*

### 4.     The Government's Opposition

The Government responds that "*Duquette* is still controlling precedent in the First Circuit and must, therefore, be applied in this case." *Gov't's Opp'n* at 1. In support, the Government cites *Dimott*, 881 F.3d at 234 n.1. *Id.* The Government

notes that in his dissent, Judge Torruella observed that the district court is still bound by the circuit rule in *Duquette* despite *Mathis*. *Id.* (citing *Dimott*, 881 F.3d at 246) (Torrurella J., dissenting)). Moreover, the Government argues that "*Mathis* decides nothing new" and is a mere "reassertion of the rules set forth in *Taylor*." *Id.* at 2. "Simply put, since *Mathis* has not changed the ruling of *Taylor* on which *Duquette* was based, there is no basis in *Mathis* for now ignoring *Duquette*." *Id.*

In addition, the Government says that Mr. Bowers' argument is foreclosed by his concession that the Maine burglary statute is an indivisible statute. *Id.* With that concession, the Government argues, Mr. Bowers may not look outside the statute itself under *Taylor* and *Mathis*. *Id.* To do so, in the Government's view, would require the Court to make a forbidden "factual determination of the nature of the places he burglarized." *Id.* at 3.

Finally, the Government rejects Mr. Bowers' position that because at the Rule 11, the state prosecutor described the structure Mr. Bowers burglarized as a storage trailer, this means that the structure was mobile. *Id.* In the Government's words, "just as wood can become a house, so too can a once mobile object become a stationary structure." *Id.* Thus, "even if Bowers is to be believed, it does not necessarily follow that the places he burglarized were not structures within the meaning of *Taylor*, *Mathis*, and *Duquette*." *Id.*

## C.    DISCUSSION

On its face, the resolution of this issue appears easy. The ACCA applies if a defendant has previously committed at least three violent felonies. The ACCA

defines a "violent felony" to include "burglary," and Mr. Bowers had been convicted of four burglaries, all felonies, before committing his present felony of being a felon in possession of a firearm crime. The conclusion that Mr. Bowers is subject to the enhanced sentencing provisions of the ACCA would seem a foregone conclusion.

But something so significant in the law is rarely so simple. In *Taylor*, the United States Supreme Court addressed the problem that "[t]he word 'burglary' has not been given a single meaning by the state courts; the criminal codes of the States define burglary in many different ways." 495 U.S. at 580. The *Taylor* Court concluded that the term, "burglary," "must have some uniform definition independent of the labels employed by the various States' criminal codes." *Id.* at 592. The Supreme Court adopted the following "generic" definition of "burglary" for purposes of the ACCA: "An unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." *Id.* at 598.

Significantly, for purposes of Mr. Bowers' argument, the Supreme Court elected not to limit the generic definition of burglary to buildings, but included "structures." *Id.* (citing W. LaFave & A. Scott, Substantive Criminal Law § n.3, §§ 8.13(c), p. 471(1986) ("modern statutes 'typically describe the place as a 'building' or 'structure'")). The *Taylor* Court also established an analytic framework under which the question of whether a state burglary statute constitutes a generic burglary that the ACCA recognizes as a predicate felony. The Supreme Court wrote that if the state statute is narrower than a generic burglary, there is "no problem, because the conviction necessarily implies that the defendant has been found guilty of all the

8

elements of generic burglary." *Id.* at 599. "And if the defendant was convicted of burglary in a State where the generic definition of has been adopted, with minor variations in terminology, then the trial court need find only that the state statute corresponds in substance to the generic meaning of burglary." *Id.*

In 2015, in *Duquette*, the First Circuit directly addressed whether a conviction under the Maine burglary statute is a proper ACCA predicate. 778 F.3d 314. The state burglary statute for Mr. Bowers' and Mr. Duquette's convictions is 17-A M.R.S. § 401. Mr. Bowers was convicted of violating both 17-A M.R.S. § 401(1)(A) and § 401(1)(B)(4):

**1.** A person is guilty of burglary if:

**A.** The person enters or surreptitiously remains in a structure knowing that that person is not licensed or privileged to do so, with the intent to commit a crime therein. Violation of this paragraph is a Class C crime; or

**B.** The person violates paragraph A and:

**(4)** The violation is against a structure that is a dwelling place. Violation of this subparagraph is a Class B crime.

To be guilty of a § 401(1)(B)(4) violation, Mr. Bowers first had to be guilty of violating § 401(1)(A). Like Mr. Bowers, Mr. Duquette was convicted of violating. § 401(1)(A).

In *Duquette*, the First Circuit ruled:

By its clear and unambiguous terms, the statute [17-A M.R.S. § 401(1)] contains all of the elements of "generic burglary" that the Supreme Court set forth in *Taylor*. Duquette, in fact, concedes this in his brief. *See* Appellant's Br. at 8 (quoting *Taylor*, 495 U.S. at 599 . . . ("The statutory elements match the elements of 'generic burglary' defined as 'unlawful or unprivileged entry to a building or structure with the intent to commit a crime.'")). We find, therefore, that this statutory definition

of burglary "substantially corresponds to 'generic' burglary." *Taylor*, 495 U.S. at 602 . . . .

778 F.3d at 318. The First Circuit made its holding plain: "because Maine's burglary statute sets forth the definition of 'generic burglary' under *Taylor*, a conviction under that statute qualifies as a "violent felony" under the ACCA." *Id.* Applying *Duquette* to Mr. Bowers' case, his four Maine burglary convictions count as ACCA predicates and he is therefore subject to the mandatory provisions of the law and the Armed Career Criminal provision of the Guidelines.

Mr. Bower, however, urges the Court to discount *Duquette* because after the First Circuit issued *Duquette*, the United States Supreme Court decided *Mathis* and, in Mr. Bowers' view, *Mathis* dictates a different result. Mr. Bowers is not the first to attack *Duquette* following *Mathis*. The judges in this District have issued a number of opinions after *Mathis*, addressing issues similar to the issue Mr. Bowers is raising; each applies *Duquette*. *Yeaton v. United States*, No. 2:04-cr-00123-GZS, 2:16-cv-00333-GZS, 2017 WL 1194185, 2017 U.S. Dist. LEXIS 47386 (Mar. 30, 2017), *affirmed* 2017 U.S. Dist. LEXIS 66365 (May 2, 2017) (certificate of appealability granted); *McCurdy v. United States*, Nos. 1:06-cr-00080-JAW, 1:15-cv-00532-JAW, 2017 WL 74695, 2017 U.S. Dist. LEXIS 1947 (D. Me. Jan. 6, 2017); *Collamore v. United States*, Nos. 2:10-cr-158-GZS, 2:16-cv-259-GZS, 2016 WL 6304668, 2016 U.S. Dist. LEXIS 148757 (D. Me. Oct. 27, 2016); *United States v. Casey*, Nos. 2:11-cr-216-DBH, 2:16-cv-346-DBH, 2016 WL 6581178, 2016 U.S. Dist. LEXIS 153085 (D. Me. Nov. 3, 2016); *Dimott v. United States*, Nos. 2:06-cr-26-GZS, 2:16-cv-347-GZS, 2016 U.S. Dist. LEXIS 142354 (Oct. 14, 2016). In explaining why it is following *Duquette*,

the Court can do no better than what it and the other district judges have already done.

In *Dimott*, the First Circuit addressed appeals in the *Dimott*, *Casey*, and *Collamore* cases but did not directly reach the *Mathis* argument because of issues unique to those cases. 881 F.3d at 233-43. In dissent, Judge Torruella observed that in *Casey*, the district court concluded it was "bound by this Circuit's precedent to find that Maine burglary is generic and also falls under the enumerated clause." *Id.* at 246 (Torruella, J., dissenting). Judge Torruella wrote that "[t]he district court was correct in its ruling given its boundaries." *Id.* Judge Torruella suggested that the First Circuit itself is not "so constrained" in assessing the continued vitality of its own precedent. *Id.* The lesson from Judge Torruella's dissent in *Dimott* is that if *Duquette* is to be revisited, the First Circuit, not a district court, must do so.

Although the appeal in *McCurdy* has been dismissed, the district court docket sheet reflects that Mr. Yeaton appealed the district court decision to the First Circuit and that his appeal is still pending before the Circuit. *Yeaton v. United States*, No. 2:04-cr-00123-GZS-1, *Notice of Appeal* (ECF No. 55). The Government states that a similar question is now pending before the United States Supreme Court in *United States v. Stitt*, 860 F.3d 854 (6th Cir. 2017), *cert. granted* 138 S. Ct. 1592 (2018), and is scheduled for oral argument before the high court on October 9, 2018.[4] Based on

---

[4]     While this Order was being drafted, the Supreme Court of the United States heard two cases concerning the ACCA and the implication of prior burglary convictions. *United States v. Stitt*, 860 F.3d 854 (6th Cir. 2017), *cert. granted*, 138 S. Ct. 1592 (No. 17-765); *United States v. Sims*, 854 F.3d 1037 (8th Cir. 2017), *cert. granted*, 138 S. Ct. 1592 (No. 17-766). At oral argument for the consolidated case involving the *Sims'* and *Stitts'* petitions, Justice Alito stated, "a majority of the Court really hates ACCA and is picking it apart bit by bit by bit." *Tr.* 25:12-15. While it is difficult to read the tea leaves from an oral argument, Justice Alito's comments suggest that the Supreme Court may further narrow

these developments, the status of the Maine burglary statute as an ACCA predicate may well be clarified by the Supreme Court or by the First Circuit before Mr. Bowers is scheduled for a sentencing hearing, and if so, this Court will of course follow the lead of the higher appellate courts to which it owes allegiance. For now, by the same token, the Court is required to, and will, apply First Circuit precedent in *Duquette* for purposes of its sentencing of Mr. Bowers unless and until the Supreme Court eclipses the First Circuit or the First Circuit overrules itself. The Court concludes that Mr. Bowers is subject to the provisions of the ACCA and to the corresponding Guideline provision for Armed Career Criminals.

## IV. USE OF A FIREARM IN CONNECTION WITH ANOTHER FELONY UNDER § 2K2.1(b)(6)(B)

### A. Background

Section 2K2.1(b)(6)(B) of the Guidelines states:

> If the defendant used or possessed any firearm . . . in connection with another felony offense; or possessed . . . any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels.

In the PSR, the Probation Office considered but rejected this enhancement based on its view of the circumstances of Mr. Bowers' firearm possession. PSR ¶ 21. The Government contends that the Court should impose the four-level enhancement because "the defendant illegally used the gun in his altercation with Mr. Taylor"

---

the applicable predicate state convictions for ACCA. It may be sensible to wait for the Supreme Court to issue an opinion on *Sims* and *Stitt* before sentencing Mr. Bowers. According to the PSR, Mr. Bowers has been detained since September 14, 2017 and therefore, he is not in imminent danger of overstaying his sentence, whichever guideline range applies.

which it maintains constituted a violation of a variety of Maine state criminal laws. *Gov't's Mem.* at 2-3.[5] Mr. Bowers objects, contending that Mr. Bowers did not draw his firearm and, if he did, his resort to a firearm was a response to aggressive behavior by Justin Taylor and therefore, Mr. Bowers was acting in self-defense. *Def.'s Opp'n.* at 1-2.

In its response, the Government concedes that even if the video does not show Mr. Bowers "fully produc[ing] his firearm and point[ing] the muzzle at Mr. Taylor before Mr. Taylor struck Mr. Bowers with a wrench[,]" *Gov't's Opp'n* at 3-4, Mr. Bowers, nevertheless, reached behind his back with his right hand and pulled his hand up, an act that the Government contends is "consistent with attempting to draw the firearm from the holster Bowers admitted he was wearing all day." *Id.* at 4. The Government argues that the "salient fact" is Mr. Taylor's testimony that Mr. Bowers had threatened to kill him, which then caused Mr. Taylor to strike Mr. Bowers with the wrench. *Id.* Threatening to kill Mr. Taylor while putting his hand on his gun constitutes, in the Government's view, the commission of one of a number of state

---

[5] The Government says that Mr. Bowers' actions violated the following Maine criminal laws: Threatening with a Dangerous Weapon, 17-A M.R.S. § 209, Reckless Conduct with a Dangerous Weapon, 17-A M.R.S. § 211, Aggravated Reckless Conduct, 17-A M.R.S. § 213, and Terrorizing, 17-A M.R.S. § 210. Criminal Threatening, Reckless Conduct, and Terrorizing are all Class D crimes; Aggravated Reckless Conduct is a Class B crime. Under Maine law, a Class D crime—without more—is not a felony; a Class B crime is a felony. *See* 17-A M.R.S. § 1252(2)(B), (D). However, under section 1252(4), if the state of Maine pleads and proves that a Class D crime was committed with the use of a dangerous weapon, "then the sentencing class for such crime is one class higher than it would otherwise be." § 1252(4). Therefore, if Mr. Bowers used a dangerous weapon when he committed the acts that would constitute any of the Class D crimes, the penalty would rise to Class C, which is a felony. *See* § 1252(2)(C) ("In the case of a Class C crime, the court shall set a definite period not to exceed 5 years").

felonies. *Id.* The Government urges the Court to reject Mr. Bowers' denials as incredible. *Id.*

Mr. Bowers sees the same evidence very differently. He says that during the entirety of the video, "the gun is <u>never</u> drawn." *Def.'s Opp'n* at 2 (emphasis in original). Mr. Bowers contends that Mr. Taylor was the aggressor and when he reached toward his back, he was "mere seconds away from being struck with a wrench." *Id.* Mr. Bowers urges the Court to reject Mr. Taylor's testimony about events off-camera as incredible. *Id.*

### B.    The July 24, 2018 Evidentiary Hearing

On July 24, 2018, the Court held an evidentiary hearing at which Mr. Taylor, Kara Cunningham, and Mr. Bowers testified. *Tr.* 19:20-119:24. In addition, the parties admitted twenty exhibits, including a DVD of a surveillance video of the incident of April 9, 2016. *See Court Ex. List* (ECF No. 84). The video contains no audio. *DVD of Surveillance Video of Apr. 9, 2016 Incident, Gov't's Ex.* 1. Mr. Taylor is the owner of an auto mechanic garage in Chelsea, Maine where the April 9, 2016 incident took place, and Mr. Taylor was involved in the altercation with Mr. Bowers. *Tr.* 20:8-11, 21:14-22:23. Ms. Cunningham is Mr. Taylor's girlfriend, and she was working at Mr. Taylor's garage the morning of April 9, 2016. *Id.* 62:25-72:25.

### C.    The DVD

The admitted DVD is from a security camera located above one of the bays in the garage. *Gov't's Ex.* 1. It is 8 minutes and 52 seconds long. It shows Mr. Bowers cleaning up and shoveling some debris and placing it in a barrel. In the bay is also

Katelyn Taylor, Mr. Taylor's younger sister, and Mr. Bowers' son.[6] After Mr. Bowers is finished cleaning, he mills about the bay for a while. His son appears and then goes outside. Mr. Taylor backs a vehicle into the bay and uses a hand jack to lift it and let it down and Mr. Taylor drives the vehicle out of the garage. At this point, Mr. Bowers, his son and Ms. Taylor are momentarily in the bay. Mr. Taylor comes in briefly and leaves again. For a short time, Mr. Bowers and Ms. Taylor are in the bay and then Mr. Taylor reenters, and goes into another bay. Mr. Bowers goes in and out of the area where Mr. Taylor is located, but neither is visible. According to the video time, this part of the DVD ends at 3:01:46.

The next part of the DVD begins at 3:06:45. It shows Mr. Taylor and Mr. Bowers standing on the far side of the bay, having a discussion. Mr. Taylor has what it later confirmed as a wrench in his right hand. Ms. Taylor is standing facing Mr. Bowers to the left side of Mr. Taylor. There is a black dog lying on the bay floor between Mr. Taylor and Ms. Taylor. Mr. Bowers steps away twice, first at 3:07:27, returning at 3:07:32, and he momentarily walks away at 3:07:42-43. Mr. Bowers stands with his legs crossed and his left arm resting against a stack of tires.

At 3:07:58, Mr. Taylor becomes animated. Even though there is no audio, it appears that Mr. Taylor is raising his voice and he begins waving the wrench and moving toward Mr. Bowers. At 3:08:00, Mr. Taylor starts walking toward Mr. Bowers and gesticulating. The videotaped portion of this part of the encounter lasts only about seven seconds. Ms. Taylor steps between her brother and Mr. Bowers at

---

[6]     The video has no audio, but during his testimony, Mr. Taylor identified the young woman as Katelyn, his younger sister, and the boy as Mr. Bowers' son. *Tr.* 23:23-24:11.

3:08:00. She is initially facing Mr. Bowers and she holds him at arm's length with both arms at 3:08:02. She then positions herself between the two men with her right arm on her brother's chest and her left arm on Mr. Bowers' chest. Mr. Taylor breaks over his sister's arm and lunges at Mr. Bowers, striking him with the wrench. The three disappear out the bay door at 3:08:09 with Mr. Bowers backing up and Mr. Taylor moving forward.

Focusing on Mr. Bowers, he is wearing a t-shirt that is not tucked in. At 3:07:58, when Mr. Taylor becomes animated and waves the wrench, Mr. Bowers takes his right hand and pulls up the right rear side of his t-shirt, seeming to reach for his gun, which is in a holster on his right rear hip. In doing so, he pulls the t-shirt up over the holster, exposing it. He does not, however, pull out the firearm. He pushes Ms. Taylor's arms away and backs up one large step. As Mr. Taylor continues to approach, Mr. Bowers reaches again for the holster, and about at the same moment Mr. Taylor lunges toward him. The three disappear out the bay with Mr. Taylor swinging the wrench and Mr. Bowers flailing his arms.

According to the PSR, Mr. Taylor hit Mr. Bowers on the head with the wrench one to three times, and knocked him unconscious. PSR ¶ 8. While Mr. Bowers was on his back, Mr. Taylor hit him with his fists one to three more times. *Id.* The PSR says that Mr. Bowers "reportedly possessed a handgun in his hand while on the ground and unconscious." *Id.* This is not shown, however, in the DVD.

Based on the DVD alone, the Court would not conclude that Mr. Bowers possessed the firearm in connection with another felony. The crimes of Criminal

Threatening, 17-A M.R.S. § 209, Reckless Conduct, 17-A M.R.S. § 211, and Terrorizing, 17-A M.R.S. § 210, are all Class D crimes, which are misdemeanors under Maine law. 17-A M.R.S. § 1252(2)(D) ("In the case of a Class D crime, the court shall set a definite period of less than one year"). To elevate a Class D crime to a Class C crime, which is a felony, the state of Maine must prove that the defendant committed the crime "with the use of a dangerous weapon." 17-A M.R.S. § 1252(4). The DVD reveals no evidence that Mr. Bowers used his firearm to commit any of these crimes.

Aggravated reckless conduct is a Class B crime and is a felony. 17-A M.R.S. § 213(2); 17-A M.R.S. § 1254(2)(B) ("In the case of a Class B crime, the court shall set a definite period not to exceed 10 years"). However, to be guilty of aggravated reckless conduct, a defendant "with terroristic intent engages in conduct that in fact creates a substantial risk of serious bodily injury to another person." 17-A M.R.S. § 213(1). The DVD itself, however, does not reveal that Mr. Bowers was engaged in conduct that created a substantial risk of bodily injury to Mr. Taylor. If anything, Mr. Taylor, by initiating contact with Mr. Bowers and swinging a wrench at him, was the aggressor and it was Mr. Bowers who sustained a serious bodily injury.

### D. The Testimonial Hearing

As Mr. Taylor recalled it, he and Mr. Bowers were arguing because Mr. Bowers had been rude to a customer. *Tr.* 21:17-22. Mr. Taylor testified that the argument "escalated quickly" and he told Mr. Bowers that he would "call the cops if he didn't leave." *Id.* 21:23-25. He said that Mr. Bowers was "still walking back and forth

arguing, ripped his sweatshirt off, wanting to fight." *Id.* 21:24-22:1. Mr. Taylor said that Mr. Bowers was "acting like he wanted to fight," "kept reaching for his gun," "went to pull the gun," and "that's when I swung." *Id.* 22:4-7. Mr. Taylor testified that Mr. Bowers told him, "I will fucking kill you," and that he reached for his gun. *Id.* 26:21-27:1. As he recalled it, Mr. Bowers reached for his gun, which caused Mr. Taylor to start swinging. *Id.* 26:24-27:5.

On cross-examination, Mr. Taylor acknowledged that in one of his earlier statements, he had written that Mr. Bowers had pulled his gun and that he hit Mr. Bowers after that. *Id.* 38:22-39:5. However, during his testimony, Mr. Taylor admitted that the video reveals he had begun hitting Mr. Bowers before Mr. Bowers pulled his gun. *Id.* 38:6-9. He admitted that his written statement to the sheriff's office made no mention of Mr. Bowers' threat. *Id.* 38:12-39:2. He also agreed that he had told Agent Christopher Concannon that he only swung the wrench after Mr. Bowers had pulled a gun. *Id.* 40:15-17.

During his testimony, Mr. Bowers recalled the details of the argument between Mr. Taylor and himself, and Mr. Taylor telling him to leave his premises. *Id.* 90:5-24. Mr. Bowers pointed to his "lackadaisical demeanor" and said that the "only person advancing is Justin." *Id.* 92:3-6. As Mr. Taylor advanced, Mr. Bowers thought that Mr. Taylor was going to hit him with the wrench. *Id.* 92:7-9. Mr. Bowers denied telling Mr. Taylor that he would "fucking kill" him. *Id.* 99:2-7. He said, "I don't speak like that." *Id.*

Although Mr. Taylor and Mr. Bowers disagree on some essential points, the Court concludes that their testimony, along with the testimony of Kara Cunningham, does not sustain the Government's burden of proof to demonstrate that it is more likely than not that Mr. Bowers "used or possessed any firearm . . . in connection with another felony offense; or possessed . . . any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). As best the Court can piece together the evidence, including the contents of the DVD, Mr. Taylor, not Mr. Bowers, was the aggressor and Mr. Taylor, not Mr. Bowers, had become suddenly vocal and angry. Mr. Bowers' response was to place his hand on his holstered gun, but the Court is not convinced he ever actually drew it. If Mr. Bowers intended to pull his firearm, Mr. Taylor's quickness in lunging with the wrench and swinging at Mr. Bowers did not allow him time to do so. The one witness who might have been able to clear the fog about what happened between the two men is Ms. Taylor, Mr. Taylor's younger sister, who bravely stood between the two men and attempted to play peacemaker. However, neither the Government nor Mr. Bowers called Ms. Taylor as a witness. The Court is left with evidence that is equivocal at best and does not sustain the Government's burden of proof. The Court declines to apply the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B).

## V. OBSTRUCTING OR IMPEDING THE ADMINISTRATION OF JUSTICE UNDER U.S.S.G. § 3C1.1[7]

---

[7] The Court's determination that Mr. Bowers is subject to the ACCA means he is subject to a statutory mandatory minimum of fifteen years of imprisonment. 18 U.S.C. § 922(e)(1). It also affects

## A.        Background

Section 3C1.1 of the Guidelines states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The Probation Office recommended application of this two-level enhancement. PSR ¶¶ 16, 24. In paragraph sixteen, the Probation Office stated that two witnesses "reported to authorities that Bowers telephoned them on the evening of April 9, 2016" and "asked the witnesses to delete the video footage recorded by the security camera and to assert to authorities that the weapon recovered at the scene was Taylor's gun." *Id.* ¶ 16. In exchange for their cooperation, Mr. Bowers told them that they could "keep the gun." *Id.* The Probation Office concluded that Mr. Bowers' conversations amounted to an attempt to unlawfully influence a witness or to get another person to destroy or conceal evidence, justifying the obstruction of justice enhancement. *Id.*

---

his guideline calculations. U.S.S.G. § 4B1.4. Under the Probation Office's calculations, for example, but for the ACCA, Mr. Bowers would have had a total offense level of 21 and he would have been a criminal history category of III. PSR ¶¶ 25, 27A-27B, 37. With a total offense level of 21 and a criminal history category of III, the guideline range for imprisonment, but for the ACCA, would have been 46 to 57 months. However, § 4B1.4(b)(3)(A) jumps Mr. Bowers' offense level to 34 because he possessed a silencer and his criminal history category escalates to VI for the same reason. With acceptance of responsibility, the resulting guideline sentence range is 188 to 235 months, PSR ¶ 63, and the Court must impose a sentence of at least fifteen years. 18 U.S.C. § 922(e)(1).

　　If the ACCA applies to Mr. Bowers' case, there would be no practical need for the Court to make the other guideline calculations because they are trumped by the statutory and guideline provisions of the ACCA. Nevertheless, the Court is addressing these issues because it is possible that, either before or after he is sentenced, the Supreme Court or the First Circuit will clarify whether the ACCA should be applied to defendants like Mr. Bowers, and technically, the proper way to calculate the guidelines is first to determine the guideline calculations without the Chapter Four enhancements and then to determine the impact of the Chapter Four provisions on the resulting sentencing range.

Mr. Bowers objects to the obstruction of justice enhancement and the Government supports it. At the testimonial hearing, the Government produced the testimony of Kara Cunningham. *Tr.* 62:25-73:5. Ms. Cunningham is Mr. Taylor's girlfriend and she also has a tangential relationship with Mr. Bowers as he is "the brother to [her] cousin's ex-husband." *Id.* 63:2-16. The evening of the altercation at Mr. Taylor's garage, Ms. Cunningham testified that Mr. Bowers called her from the hospital and asked her to say that the gun was Mr. Taylor's, not his. *Id.* 66:2-6. She replied that she would talk to Mr. Taylor and she ended the phone call. *Id.* 66:19-21.

The Court declines to apply the obstruction of justice enhancement to Mr. Bowers. The Court accepts Ms. Cunningham's testimony and the facts in paragraph sixteen of the PSR. Nevertheless, for the obstruction of justice enhancement to apply, the Government must prove that Mr. Bowers acted "willfully." U.S.S.G. § 3C1.1 ("If (1) the defendant willfully obstructed . . . ."). Under First Circuit law, "willfulness generally means that an act was undertaken with a 'bad purpose,' that is, with knowledge that the act is unlawful." *United States v. Iwuala*, 789 F.3d 1, 12 (1st Cir. 2015); *see also United States v. Ramirez*, 495 F. Supp. 2d 92, 115 (D. Me. 2007) (quoting *Bryan v. United States*, 524 U.S. 184, 191-92 (1998)). The PSR reflects that Mr. Bowers was knocked unconscious by Mr. Taylor, that he was taken to the hospital for medical treatment, that he had no recollection of the events, that he suffered a traumatic brain injury as a result of the altercation, that he also suffered vertigo, hearing loss, and double vision, and that, although he did not sustain a skull fracture or intracranial bleeding, he has been treated for post-concussive syndrome. PSR ¶¶

21

8-9, 49.  Mr. Bowers testified that he continues to suffer symptoms from the April 9, 2016 incident.  *Tr.* 83:19-84:2.  Absent more evidence about his state of mind during the evening of April 9, 2016 while he was hospitalized, the Court does not conclude that the Government sustained its burden to prove that Mr. Bowers had the requisite "culpable state of mind" that evening to act in a willful manner.  *United States v. Troisi*, 849 F.3d 490, 494 (1st Cir. 2017).

## VI.    ACCEPTANCE OF RESPONSIBILITY

Under U.S.S.G. § 3E1.1, a defendant is entitled to a two-level reduction in his guideline calculations if he "clearly demonstrates acceptance of responsibility." U.S.S.G. § 3E1.1(a).  He is entitled to a further one-level reduction if the government moves for it.[8]  *Id.* § 3E1.1(b).  Here, Mr. Bowers pleaded guilty to the offense of conviction and there is no evidence that he falsely denied relevant conduct and therefore ordinarily, he would be entitled to the three-level reduction.  *Id. Application Note* 3 (indicating that the entry of a plea of guilty prior to the commencement of trial constitutes significant evidence of acceptance of responsibility for purposes of subsection (a)).  The Probation Office recommended that Mr. Bowers be granted a three-level reduction for acceptance of responsibility.  PSR ¶¶ 17, 27A-27.

The Government objects based on the fact that Mr. Bowers was involved in a fight with another inmate at Somerset County Jail on April 5, 2018.  The Government presented a DVD of an altercation on April 5, 2018, in the Somerset County Jail

---

[8]     The Court assumes that the Government will move for the third point under § 3E1.1(b) because it is rare for it not to do so, where the Court has found a defendant is entitled to acceptance of responsibility under § 3E1.1(a).

between Mr. Bowers and another inmate, *Gov't's Ex.* 4, as well as ten pages of investigative reports about the incident. *Gov't's Ex.* 5. The DVD shows Mr. Bowers playing cards with three other inmates. Mr. Bowers is in a wheelchair. The inmate to Mr. Bowers' right stands up, Mr. Bowers wheels his wheelchair back, and the inmate takes a swing at Mr. Bowers with his right fist. Mr. Bowers stands up from the wheelchair and the two of them start to exchange blows, ultimately wrestling on the floor, when corrections officers quickly emerge to separate the inmates and stop the fight. After the corrections officers separate the inmates, Mr. Bowers continues to lunge at the other inmate and has to be held back by the other officers.

During his testimony, Mr. Bowers stated that he and Michael Pixley were playing cards with two other inmates, when Mr. Pixley began talking about an incident involving John Oliveira, Mr. Bowers' cellmate. *Tr.* 79:11-80:4. According to Mr. Bowers, Mr. Pixley said that he was going to beat up Mr. Oliveira because of the incident. *Id.* 80:1-13. Mr. Bowers said he "tried to deflect it," observing that Mr. Pixley was going to get out soon and that the incident between Mr. Pixley and Mr. Oliviera was minor. *Id.* 80:16-20. Mr. Bowers was not able to settle Mr. Pixley down and Mr. Bowers told Mr. Pixley that it had "nothing [to] do with like being macho or tough" and he thought Mr. Pixley misinterpreted the statement to challenge his toughness. *Id.* 80:23-81:1. Mr. Pixley replied that he was tougher than most of the people in the block and that he could beat up Mr. Bowers. *Id.* 81:1-4. Mr. Bowers chuckled and said to Mr. Pixley that he did not need to threaten him and that Mr. Pixley was not tougher than all the guys on the block, and Mr. Bowers motioned with

his thumb toward the pod. *Id.* 81:4-19. Mr. Pixley did not react well, balled up his fists, and told Mr. Bowers that he would "waste [him] right there." *Id.* 81:20-82:1. Mr. Bowers said that Mr. Pixley began cocking back to hit him, that Mr. Pixley threw the first punch, and that Mr. Bowers did not want to sustain another head injury. *Id.* 82:21-83:2. In addition to the DVD and Mr. Bowers' testimony, the Court reviewed the incident report from the Somerset County Jail. *Gov't's Ex.* 5.

If a defendant engages in unlawful conduct after his guilty plea, including an assault, this may be grounds for denying acceptance of responsibility. *United States v. Stile*, 845 F.3d 425, 428-32 (1st Cir. 2017); U.S.S.G. § 3E1.1, *Application Note* 1(B) ("voluntary termination or withdrawal from criminal conduct or associations"). Here, however, the DVD clearly demonstrates that Mr. Pixley, not Mr. Bowers, was the person who instigated the fight. Mr. Pixley stood up and took a swing at Mr. Bowers' head. Mr. Bowers responded by defending himself. The Government is correct that Mr. Bowers continued to try and get at Mr. Pixley after a corrections officer was attempting to hold him back. At least when Mr. Pixley stood up and took a swing at Mr. Bowers, Mr. Bowers had no choice but to defend himself. Once Mr. Pixley and Mr. Bowers began to fight, it is difficult to turn off the adrenaline and, although the Court does not condone Mr. Bowers' attempt to wiggle out of the corrections officer's grasp and get to Mr. Pixley, the Court declines to deny Mr. Bowers' acceptance of responsibility based on the unique circumstances of this altercation.

## VII. SUMMARY

The Court resolves the sentencing issues as follows:

(1) The Court concludes that Mr. Bowers is subject to the statutory and guideline provisions of the ACCA and U.S.S.G. § 4B1.4;

(2) The Court concludes that the Government has not sustained its burden to prove that Mr. Bowers used or possessed the firearm in connection with another felony offense under U.S.S.G. § 2K2.1(b)(6)(B);

(3) The Court concludes that the Government has not sustained its burden to prove that Mr. Bowers willfully obstructed justice under U.S.S.G. § 3C1.1; and

(4) The Court concludes that Mr. Bowers has accepted responsibility for the offense and is entitled to a three-level reduction under U.S.S.G. § 3E1.1.

The Court makes the following guideline calculations:

(1) **Base Offense Level: U.S.S.G. § 2K2.1(a)(4)(B):**     **20**

(2) **Specific Offense Characteristic: U.S.S.G. § 2K2.1(b)(1)(A):**     **+2**

(3) **Adjusted Offense Level:**     **22**

(4) **Chapter Four Enhancement: U.S.S.G. § 4B1.4(b)(3)(A):**     **34**

(5) **Acceptance of Responsibility: U.S.S.G. § 3E1.1(a), (b):**     **-3**

(6) **Total Offense Level:**     **31**

Mr. Bowers' criminal history score is III; however, under U.S.S.G. § 4B1.4(c)(1), his criminal history score is elevated to VI. For a total offense level of 31 and a criminal history score of VI, the applicable guideline range for imprisonment is 188 to 235 months, a fine range from $30,000 to $250,000, supervised release of two to five years, and a special assessment of $100.

If the ACCA and § 4B1.4 did not apply, Mr. Bowers would face a very different guideline calculation. His base offense level would be 20. He would receive a two-level increase for the number of firearms for an adjusted offense level of 22. His adjusted offense level would be reduced three levels to 19 for acceptance of responsibility. His criminal history score would be III. For a total offense level of 19 and a criminal history score of III, the applicable guideline range would be 37 to 46 months. His fine range would be $10,000 to $100,000. The period of supervised release would be one to three years. The special assessment would be $100.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this day 6th of November, 2018